[Cite as *In re J.H.*, 2020-Ohio-4026.]

COURT OF APPEALS
PERRY COUNTY, OHIO
FIFTH APPELLATE DISTRICT

|  |  |
|---|---|
| IN THE MATTER OF: | JUDGES:<br>Hon. John W. Wise, P. J.<br>Hon. Patricia A. Delaney, J.<br>Hon. Craig R. Baldwin, J. |
| J.H. and P.H. | Case Nos. 19 CA 00022 and<br>19 CA 00023 |
|  | O P I N I O N |

CHARACTER OF PROCEEDING:     Civil Appeal from the Court of Common Pleas, Juvenile division, Case Nos. 2016 C 250 and 2016 C 251

JUDGMENT:     Affirmed

DATE OF JUDGMENT ENTRY:     August 10, 2020

APPEARANCES:

For Appellant Mother

JAMES S. SWEENEY
285 South Liberty Street
Powell, Ohio  43065

Guardian Ad Litem

SANDRA L. BRANDON
Post Office Box 160
Rockbridge, Ohio  43149

For Appellee

JESSICA L. MONGOLD
Post Office Box 502
Lancaster, Ohio  453130

*Wise, J.*

{¶1}   Appellant-Mother appeals the November 4, 2019, decision of the Perry County Court of Common Pleas, Juvenile Division, terminating her parental rights, privileges, and responsibilities with respect to her minor children J.H. and P.H. and granting permanent custody of the children to Appellee Perry County Children Services.

STATEMENT OF THE FACTS AND CASE

{¶2}   Appellant B.B. is the biological mother of two children: J.H. (DOB 10/14/2013) and P.H. (DOB 6/25/2010).   J.H. is the biological father of both children. Paternity was established by genetic testing. (T. at 94). Father did not attend the hearing on the motion for permanent custody and has not appealed the trial court's decision.

{¶3}   On August 9, 2016, Perry County Children Services (PCCS) became involved with the family based on allegations of drug possession and abuse by Appellant-Mother arising out of an incident in which Appellant-Mother and Father appeared to be under the influence at a gas station. This eventually resulted in a traffic stop of the vehicle in which Appellant-Mother, Father, P.H. and J.H. were riding. During this traffic stop the driver of the vehicle was charged with OVI, Father was arrested on a non-support warrant, and Appellant-Mother was found with methamphetamine, prescription drugs, and drug paraphernalia on or about her person. (Complaint, Pg. 2-3).

{¶4}   On August 10, 2016, Appellant-Mother signed a Temporary Care Agreement. (T. at 95).

{¶5}   On August 19, 2016, a complaint was filed in Case No. 2016-C-251 alleging that P.H. was a dependent child. On the same date, another complaint was filed in Case

No. 2016-C-250 alleging that J.H. was an abused child. Temporary custody of both children was granted to Perry County Children's Services. (PCCS). (T. at 95).

{¶6} On August 30, 2016, Appellant-Mother signed an extension of the Temporary Care Agreement. *Id.*

{¶7} On November 1, 2016, the minor children were adjudicated and placed in the temporary custody of a relative. *Id.*

{¶8} On June 16, 2017, Perry County Children Services received temporary custody of J.H. (T. at 96).

{¶9} On July 20, 2017, Perry County Children Services received temporary custody of P.H. *Id.*

{¶10} The minor children remained in the temporary custody of Perry County Children Services from those dates until the date of the oral hearing on the motion seeking permanent custody on September 4, 2019. *Id.*

{¶11} On March 6, 2018, Perry County Children Services filed motions seeking permanent custody of P.H. and J.H.

{¶12} On May 16, 2018, a hearing was held on the motions for permanent custody.

{¶13} On June 28, 2018, the trial court granted the motions for permanent custody, and Mother appealed the decision.

{¶14} On January 17, 2019, this Court reversed and remanded the trial court's decision "with instructions for the court to appoint a GAL to represent the interests of J.H. and P.H. and to conduct further proceedings consistent with this opinion."

{¶15} On September 4, 2019, a second hearing on the motions seeking permanent custody was held. At said hearing, the trial court heard testimony from Daniel Kelty and Tracy Milner – licensed social workers, Kim Hardin – a drug and alcohol counselor, Regina Yost – a substance use disorder clinical manager, Emily Earle – a senior outpatient clinician, Kelly Valentine and Lacy Bateson – ongoing caseworkers with PCCSS, Melissa Kennedy a drug court probation officer, Appellant-Mother BB, and the Guardian ad Litem Sandra Brandon.

{¶16} Daniel Kelty testified that he is an independent social worker licensed in the State of Ohio who specializes in play therapy. (T. at 12). He testified that he began working with P.H. and J.H. approximately two and a half years before the hearing on the motion for permanent custody, and that his last sessions with the children took place on February 8, 2019, because he switched jobs. (T. at 13-14). He explained that he diagnosed J.H. "with an adjustment disorder with ruling out of attachment". (T. at 14). At the time of J.H.'s diagnosis, Mr. Kelty observed some red flags regarding J.H.'s attachment and continued to monitor his attachment. *Id.* He testified that over the course of counseling with J.H., he had observed the minor child become less anxious and less dependent upon his sibling, P.H., for instruction and less dependent on P.H. for containment of his emotions. (T. at 19).

{¶17} Mr. Kelty diagnosed P.H. "with attachment disorder and anxiety", in part due to her parentified relationship with J.H. (T. at 14-15). He explained that P.H.'s inability to relate well to peers, difficulty attaching with caregivers and adults, being overly clingy, needy and having successive distant relationships, acting out behaviors, and her parentified relationship with J.H. led to her diagnoses. (T. at 14-15). He further explained

that when a child is diagnosed with attachment disorders as a result of abuse/neglect, oftentimes they will parentify a younger sibling because that sibling is not getting what it needs from his parents so the older child tends to act as the parent, and that is what he observed between P.H. and J.H. (T. at 15). He also testified that P.H. disclosed witnessing substance abuse in the removal home, seeing a white powder being sucked up by a straw, as well as witnessing sexual activity. (T. at 16).

**{¶18}** Mr. Kelty testified that the children's foster parents followed his recommendations, and that the children were very bonded with their foster mother. (T. at 18). He recalled that at the time he stopped counseling with the minor children, he had observed a significant increase in their ability to bond in a family setting with the foster family, which he attributed to their long-term stability in their foster home as well as the parenting education within the foster home. (T. at 20-21).

**{¶19}** Mr. Kelty also testified as to a letter he wrote on April 11, 2018, indicating that, in his professional opinion, having visits take place between the children and their biological parents after the passing of so much time between contact was not in the best interest of the minor children's emotional development. (T. at 21). He also verified that he wrote another letter on December 14, 2018, indicating that a reintroduction of visitation with biological parents at that point would have been detrimental to the children's development and would place them at a higher risk for reactive attachment issues making it more difficult for them to create and maintain healthy relationships, and being reintroduced with biological parents would most certainly have a negative impact on their condition. (T. at 24). He testified that his opinion regarding the children having contact

with biological parents and the negative impact it would have on the children had not changed. (T. at 24-25).

{¶20} Tracy Milner testified that she is a licensed social worker and that she began working with P.H. and J.H. as their primary counselor in May, 2019, after Daniel Kelty changed jobs. (T. at 34-36). Ms. Milner stated that she completed new mental health assessments of the minor children when she began counseling with them and that she diagnosed J.H. with an unspecified adjustment disorder. (T. at 36). She testified that the factors that led to this diagnosis included adjusting to a new living arrangement after disruptive placements and removals, outbursts, display of mixed emotions and difficulty transitioning. (T. 37-38).

{¶21} Ms. Milner diagnosed P.H. with post-traumatic stress disorder for under the age of six, as well as adjustment disorder with mixed emotions and conduct disturbances. (T. at 36). She explained that the factors that led to P.H.'s diagnosis of post-traumatic stress disorder included her removal from home, a couple of different placements before the age of six, and neglect before the age of six. (T. at 37). She further explained that the factors that led to P.H.'s diagnosis of adjustment disorder included her removals, disruptive placements, outbursts, display of mixed emotions and difficulty transitioning. (T. at 37-38). Ms. Milner also testified that P.H. also shows characteristics and traits of reactive attachment disorder. (T. at 38).

{¶22} She explained that the stability provided by the children's foster parents and the extended family of the foster parents was "major" for the children, and that if the children lost the stability provided by the foster parents they would regress. (T. at 40). She warned that the children would have more acting out behaviors and would have to

relearn how to love and trust again if they lost the stability provided by the foster parents. (T. at 41). Ms. Milner emphasized that permanency was absolutely important for both children's long-term progress. *Id.* She testified that J.H. had been able to assimilate to the foster family very well because he did not have a recollection of living with his biological parents and as a result was not subject to the same amount of trauma as P.H. (T. at 42-43).

**{¶23}** Kim Hardin testified that she is a LCDC II drug and alcohol counselor and caseworker for Integrated Services, and that she was working with Appellant-Mother to help her obtain housing and to monitor her recovery. (T. at 54-55). Ms. Hardin testified that while Mother had obtained housing, it had not been inspected nor had Mother moved in. (T. at 55).

**{¶24}** Regina Yost testified that she is a substance use disorder clinical manager for Perry Behavioral Health and that a clinician at Perry Behavioral Health completed an assessment of Appellant-Mother in 2016 with a recommendation for outpatient treatment. (T. at 61-64). She testified that Appellant-Mother received an approved discharge from counseling on February 7, 2017, but that Mother was re-referred for another assessment in January, 2018, by Muskingum County Adult Probation as part of a presentence investigation. (T. at 65). Ms. Yost completed the re-assessment and recommended residential treatment for substance use disorder followed by intensive outpatient treatment and standard outpatient aftercare, both group and individual sessions, to continue mental health treatment, and to maintain abstinence and attend 12-step meetings. (T. at 67). She stated that Appellant-Mother did not follow the treatment recommendations because she became incarcerated and was discharged from Perry

Behavioral Health on February 28, 2018. (T. at 68). She stated that Appellant-Mother remained incarcerated for nine (9) months on that occasion. (T. at 70).

**{¶25}** Emily Earle testified that she is a senior outpatient clinician at Allwell Behavioral Health. (T. at 74). Ms. Earle told the court that Appellant-Mother did not participate in counseling between February 7, 2018, and April 4, 2019. (T. at 74-76).

**{¶26}** Kelly Valentine testified that she is an ongoing caseworker with Perry County Children Services and had been assigned to this family from June, 2019, through the date of the permanent custody hearing. (T. at 80). Ms. Valentine testified that she had no contact with Father, and his whereabouts were unknown. (T. at 81). She further testified that Appellant-Mother had been in drug court with the Perry County Municipal Court the entire time she had been assigned as the family's caseworker. (T. at 82). Ms. Valentine testified that Appellant-Mother had been compliant with her case plan from June, 2019, except that Appellant-Mother would not share if she obtained housing. (T. 84, 89).

**{¶27}** Lacy Bateson also works for Perry County Children Services as an ongoing caseworker and worked with P.H., J.H. and the parents from August 9, 2016, through the beginning of May, 2019. (T. at 93-94). Ms. Bateson testified that J.H. was initially placed with foster parents from August 10, 2016, to August 19, 2016, but was then placed with his paternal grandparents from August 19, 2016, to November 1, 2016. J.H. remained in his paternal grandparents' temporary custody from November 2, 2016, to June 16, 2017, after which J.H. was placed with his current foster parents from June 16, 2017, to the date of the permanent custody hearing, totaling two years, two months and twenty days. (T. at 97-98).

**{¶28}** Ms. Bateson testified that P.H. was also initially placed with foster parents from August 10, 2016, to August 19, 2016, but was then placed with her paternal grandparents from August 19, 2016 to November 1, 2016, where she remained in their temporary custody from November 2, 2016, to July 20, 2017. P.H. was then placed with her current foster parents from July 20, 2017, to the date of the permanent custody hearing, being two years, one month and sixteen days. (T. at 96-97).

**{¶29}** Ms. Bateson testified that she developed a case plan with the family on September 15, 2016. (T. at 98). The initial concerns identified in the case plan were the parents' drug use, the children's inability to self-protect, and parents' lack of safe and stable housing. (T. at 99). She stated that Appellant-Mother initially completed her drug and alcohol assessment on November 8, 2016, and that she was successfully discharged from counseling by Perry Behavioral Health despite not completing all of the recommendations. (T. at 99-100). She testified that from March, 2017, through May, 2017, Mother missed several random drug screens and in May, 2017, she tested positive. (T. at 101). Ms. Bateson re-referred Appellant-Mother to Perry Behavioral Health for an assessment on June 8, 2017, due to the positive drug screen, but Appellant-Mother failed to schedule an assessment. (T. at 101-102). She testified that she referred Mother for another assessment on October 16, 2017, due to another positive drug screen. (T. at 101). She stated that Appellant-Mother did make an appointment for October 27, 2017, as a result of the second re-referral. *Id*. Ms. Bateson testified that on December 15, 2017, Appellant-Mother overdosed on heroin and was again re-referred for a drug and alcohol assessment. (T. at 102, 112). She testified that the parents were requested to comply with Integrated Services for housing and mental health counseling, and that they

cooperated with Integrated Services from September, 2016, to January 4, 2017. (T. at 103). She testified that after that time, the parents made no progress on the case plan component requiring them to comply with Integrated Services while she was the ongoing caseworker, and they never obtained independent housing. (T. at 104). She stated that the parents did not consistently attend mental health counseling and did not comply with the ISAM Drug Testing Program. (T. at 104-105). She further testified that Appellant-Mother had not visited with the minor children from February 13, 2018, through the date of the permanent custody hearing. (T. at 111). She testified that Mother was incarcerated from February 13, 2018, until November 2, 2018, and that Appellant-Mother made no effort to contact her, nor did she respond to caseworker's attempts to engage her from the date of her release from prison in November, 2018, until she was re-incarcerated on April 16, 2019. (T. at 113-116).

**{¶30}** Lacy Bateson testified that Appellant-Mother was presently staying with her parents, and that PCCS had concerns about Appellant-Mother's parents' drug use and indicated that the parents had declined to submit to a drug test. (T. at 105).

**{¶31}** The trial court also heard from Melissa Kennedy, a drug court probation officer for the Perry County Municipal Court, who testified that Appellant-Mother entered the drug court program May 16, 2019, and was in phase two of the program as of the date of the hearing on the motion for permanent custody. (T. 131-134). Ms. Kennedy explained that the drug court program typically lasts one year, and there are four phases to the program. (T. at 135). She stated that she had no knowledge of Appellant-Mother's compliance with PCCS prior to May 16, 2019. (T. at 137).

{¶32} Appellant-Mother B.B. testified that at the present time, she was residing with her parents. (T. at 140). She testified that she would be moving into her own apartment, but had not yet signed the lease. (T. at 140-141). She further testified that her drug addiction began with prescribed medications, including Vicodin, Clonopin, Tramadol, Gabapentin, Zyprexa, and Seroquel, but when her doctor quit writing her prescriptions due to her positive drug test for marijuana, she began self-medicating. (T. at 142). She admitted that she had been incarcerated on several occasions during the pendency of this matter, and that she was imprisoned for a felony conviction for possession of methamphetamine. (T. at 142-144). She testified that after she was released from prison she relapsed and was charged with possession of drug paraphernalia. (T. at 145). Mother testified that she had made progress in the drug court program, but admitted that she was not ready to fully parent the children but would like to begin visitation with them. (T. at 148). She stated "I want to hopefully someday be full - have a full relationship, like an actual mother-child relationship with my children. I want that very much so. But right now, like, I really think, like, all them full-time at first, no, I don't think I'm ready for that. Visits, yes, I do." (T. at 149).

{¶33} Lastly, the trial court heard testimony from the Guardian ad Litem Sandra Brandon, who pointed out on cross-examination of Mother, that it was three (3) years into this case and Appellant-Mother was still not in a position to have the children with her as she had no apartment, no job, and she hadn't seen her kids since February, 2018, all of which mother admitted. (T. at 162). The Guardian ad Litem testified that she believed it was in the best interest of the minor children for them to be placed in the permanent custody of Perry County Children Services. (T. at 164).

{¶34} The drug screening records from American Court Services for Appellant-Mother and Father were stipulated to and entered into evidence as exhibits.

{¶35} On November 4, 2019, the trial court issued a Final Order granting Perry County Children Services permanent custody of P.H. and J.H.

{¶36} It is from this Order Appellant-Mother appeals, raising the following assignment of error:

ASSIGNMENT OF ERROR

{¶37} I. THE TRIAL COURT'S FINDING THAT THE BEST INTEREST OF THE MINOR CHILDREN WOULD BE SERVED BY GRANTING PCCS'S MOTION FOR PERMANENT CUSTODY WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE

{¶38} This case comes to us on the expedited calendar and shall be considered in compliance with App.R. 11.2(C).

I.

{¶39} In her sole assignment of error, Appellant-Mother contends the trial court erred in finding it was in the child's best interest to grant permanent custody to PCCS. We disagree.

{¶40} As an appellate court, we neither weigh the evidence nor judge the credibility of the witnesses. Our role is to determine whether there is relevant, competent and credible evidence upon which the fact finder could base its judgment. *Cross Truck v. Jeffries,* Stark App. No. CA5758 (Feb. 10, 1982). Accordingly, judgments supported by some competent, credible evidence going to all the essential elements of the case will not

be reversed as being against the manifest weight of the evidence. *C.E. Morris Co. v. Foley Constr.*, 54 Ohio St.2d 279, 376 N.E.2d 578 (1978).

{¶41} R.C. §2151.414 sets forth the guidelines a trial court must follow when deciding a motion for permanent custody. R.C. §2151.414(A)(1) mandates the trial court schedule a hearing and provide notice upon the filing of a motion for permanent custody of a child by a public children services agency or private child placing agency that has temporary custody of the child or has placed the child in long-term foster care.

{¶42} Following the hearing, R.C. §2151.414(B) authorizes the juvenile court to grant permanent custody of the child to the public or private agency if the court determines, by clear and convincing evidence, it is in the best interest of the child to grant permanent custody to the agency, and that any of the following apply: (a) the child is not abandoned or orphaned, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents; (b) the child is abandoned; (c) the child is orphaned and there are no relatives of the child who are able to take permanent custody; or (d) the child has been in the temporary custody of one or more public children services agencies or private child placement agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999.

{¶43} In determining the best interest of the child at a permanent custody hearing, R.C. §2151.414(D) mandates the trial court must consider all relevant factors, including, but not limited to, the following: (1) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster parents and out-of-home providers, and any other person who may significantly affect the child; (2) the wishes of the child as

expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child; (3) the custodial history of the child; and (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody.

**{¶44}** Therefore, R.C. §2151.414(B) establishes a two-pronged analysis the trial court must apply when ruling on a motion for permanent custody. In practice, the trial court will usually determine whether one of the four circumstances delineated in R.C. §2151.414(B)(1)(a) through (d) is present before proceeding to a determination regarding the best interest of the child.

**{¶45}** Here, R.C. §2151.414(B)(1)(d) applies as the children have been in the temporary custody of the Agency for twelve or more months of the consecutive twenty-two month period.

**{¶46}** If the child is not abandoned or orphaned, the focus turns to whether the child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents. Under R.C. §2151.414(E), the trial court must consider all relevant evidence before making this determination. The trial court is required to enter such a finding if it determines, by clear and convincing evidence, that one or more of the factors enumerated in R.C. §2151.414(E)(1) through (16) exist with respect to each of the child's parents.

**{¶47}** As set forth in detail in our statement of the facts and case, *supra*, Appellant-Mother failed to successfully complete her case plan. Appellant-Mother herself testified that she is not ready to have the children with her full-time. Appellant-mother had not visited with the children since February 13, 2018. The trial court also heard evidence that

the mental health diagnoses for the children are the result of abusive and neglectful acts by the parents. Further, testimony was presented that the children are bonded with their foster parents, and that reunification with either parent would be detrimental and harmful to the children. The Guardian ad Litem also recommended permanent custody both at trial and in her written report to the trial court.

{¶48}   Based upon the foregoing, we find the trial court's finding that it was in the best interest of the children to grant permanent custody to PCCS is not against the manifest weight of the evidence.

{¶49}  Mother's sole assignment of error is overruled.

{¶50}  The judgment of the Court of Common Pleas, Juvenile Division, Perry County, Ohio, is affirmed.

By: Wise, P. J.

Delaney, J., and

Baldwin, J., concur.

JWW/k 0729